United States v. Darden. Good morning, your honors. May it please the court. My name is Beth Farber, and I am here representing the appellant in this case, Harvey Newkirk. We raised two issues on this appeal, which we briefed. I would like to take my limited time this morning to address only the second issue regarding whether the district court abused its discretion in excluding the defense's expert testimony. I want to start by saying that the government's case against Mr. Newkirk was weak. He was acquitted of the conspiracy and of the identity theft, which signaled that the jury had rejected the testimony of the government's two major witnesses, the cooperator and his father, who was the primary victim of the fraud. We believe that the jury convicted— You think it signals a rejection of their testimony on a wholesale basis? I believe so, your honor, because if they had believed Junior Darden, Darden Jr.'s testimony, they would have believed that Mr. Newkirk had agreed with him in a knowing and voluntary way and in a complete way to commit the fraud. I don't understand why they couldn't have rejected the testimony about an agreement, but nonetheless found that Mr. Newkirk was aware of some of the elements of falsity that were being—that were part of the narrative going forward in terms of the wire fraud. Well, if you look at all the evidence—we don't know exactly what the jury did, but if you look at all the evidence, what makes the most sense—and of course, a split verdict is in and of itself not a problem—but the evidence that we believe was relied upon, that the jury relied upon, was the evidence that came from the victim witnesses who testified that they received from Mr. Newkirk that he passed on false information, that he didn't authenticate the information, that he made statements to them about the collateral—this is what their testimony was—and about the restricted stocks, and that at certain points he—well, and also that he continued to stay in the deal after the spoof email and after the two Bank of America statements were pointed out to be identical. Senior testified that he did not authorize Mr. Newkirk to represent him, and if the jury had believed that, they would have convicted him of the identity theft. But we don't—we don't get into that kind of speculation. Juries can acquit or convict for all kinds of reasons. Our focus is on this conviction, and since you're not challenging sufficiency, we're going to look at the evidence and the like most favorable to the government in considering your two challenges. That's correct, Your Honor, and I— So we would assume that the jury believed Senior's testimony, and now you can make your argument as to why exclusion of the defense expert and the giving of the conscious avoidance charge were errors here. Yes, thank you, Your Honor. This is correct. We need to focus on the charge of conviction. It is our position that Mr. Newkirk was convicted of that not because he was guilty, but because the jury lacked the necessary information to evaluate his defense. The expert would have offered testimony regarding the duties and obligations of attorneys in a deal such as Maxim, the duty of loyalty to his client, the duty to represent his client, and this was outside the common knowledge of the juror. It was an error when Mr.—excuse me, when Judge Rakoff first— So you're saying the duty of loyalty and the duty to represent a client is outside the common knowledge of a lawyer—of a juror? I believe so, Your Honor, because the—especially in cases which were cited in the brief in which lawyers are accused of crimes involving—as part of the representation of their clients, the juries don't really understand the rights, the duties, and the obligations that lawyers owe to their clients. Weren't there lay witnesses who could have testified to the duty of loyalty? I mean, there was a transactional attorney who testified. He could have been asked about the duty of loyalty. Yes, Your Honor. I would like to address the lay witness issue, and I would like to address this specifically in the context of the Litvock case, because I believe that this case is directly controlled by this Court's decision in the United States v. Litvock. First of all, the idea that these were lay witnesses is a misnomer. They were hostile government witnesses. I think the question, though, is the trial judge excluded the expert because, among other things, there were other witnesses who could testify to these things. Is that not so, or is that wrong? That is not so, Your Honor. Nobody testified as to what the duties and obligations of a transactional lawyer—nobody testified as to whether— Witness James Ellis could have testified, if asked on cross-examination, for example, about the duty of loyalty. Well, Your Honor, as in Litvock, a defendant should not be put in a position where he has to rely on hostile opposing witnesses to provide the information to the jury that they need to evaluate his defense. And in Litvock, as in this case, Mr. Newkirk should not have been put in a position where it was a hostile witness that was testifying as to what was material to his decision and what he relied upon. The problem for you here is that it's an evidentiary ruling. The judge has enormous discretion, and we were not going to reverse unless you can show prejudice. And it's in that context that the question is whether, when there's a witness on the stand with a financial background that makes them competent to explain the transactions and the terminology presented by the case, you can claim you're prejudiced when, you know, you didn't avail yourself of the opportunity to have them tell the jury what you say is the common practice in the industry. Well, the victims represented, for example, that they were relying on what Mr. Newkirk provided to them. We'll get to that in a minute. But the question is whether you had witnesses with sufficient financial background to testify to the matters you say you wanted to put a witness on the stand to and were suggesting to you it appears that you did. And so in that sense, how can you show that you were prejudiced? We were prejudiced, Your Honor, because we were entitled to have our own expert to explain objectively and not as part of the government's case what the duties were, what materiality was in that industry, what a restricted stock was, and whether it had value as collateral, and whether the practice of shopping collateral was part of the industry practice. These were all things that the government used to suggest to the jury that Mr. Newkirk had purposely done things wrong that would have been part of the evidence of the expert. For example, the government repeatedly told the jury that restricted stock is worthless. Restricted stock is not worthless. It can be used for collateral if a lender wants to accept it as collateral. The government told the jury that shopping collateral to more than one person at a time showed an evidence of fraud. That is not correct. The expert would have said that was industry practice. The government inferred, and so did the witnesses, that they were relying on what Mr. Newkirk presented to them to be accurate, whereas the industry practice is that everyone does their own due diligence. I would say that the victims in this case were highly sophisticated people who had their own agendas. They had their own team of lawyers and accountants. These were not ignorant people. I ask you because your time is up and we should get to the real issue here. There were only two theories on which the jury was instructed it could convict, and that was if your client conveyed information that he actually knew was false or consciously avoided knowing was false. It is not obvious to me how your expert would have been, how that testimony would have had any bearing on those two factors because I did not understand him to be suggesting that anyone acting in either of those circumstances would have been acting consistent with industry practices. What is your argument with respect to that? In terms of actual knowledge, the expert would have said that it was not Mr. Newkirk's duty to investigate his own client. Not to investigate, not to convey information he actually knew was false. That was one theory that the jury was told they could convict on. The other was conveying information that he consciously avoided knowing was false. Well, Your Honor, I think those two things are related, particularly in this idea that Mr. Newkirk, which was either had a duty to investigate and authenticate, which he did not, or that he had some kind of fiduciary duty to the victims to make sure that what he conveyed was correct. And also... Without a fiduciary duty, you can't be conveying false information to induce conduct. That's true. You cannot. But if the jury believed that he had a duty to verify his client's information, then they may have felt that he... That wasn't the theory on which the judge told them they could convict. I understand. But there were suggestions in the record that the victims expected that what Mr. Newkirk was conveying had been vetted and that they were relying on it. And I know my time is up. In terms of the conscious avoidance... Use your two minutes now if you want to. Can I use one minute? And the two pieces of evidence which mostly supported the conscious avoidance verdict was the continuing to represent the Dardens after the spoof email happened and when they discovered the two Bank of America statements were identical. And in that case, the expert would have testified about the duty of an attorney to continue to represent his clients and to represent their interests. And it was not just Mr. Newkirk that continued to represent the Dardens, but the entire law firm of Brian Cave. And I'd just like to say, as in Litvak, Mr. Newkirk should not have been put in the untenable position where it was only the victims and only the hostile witnesses who were allowed to convey the concepts of his duties and the and his role in the event and the industry practice and the duties he owed to the victims. And that is why, just as in the Newkirk case, this court should reverse Mr. Newkirk's, excuse me, the Litvak case, reverse Mr. Newkirk's conviction. Thank you. Thank you. May it please the court. My name is Sarah Paul, and I'm representing the government on appeal. I also represented the government in the district court below. The judgment of conviction in this case should be affirmed. First, the evidence in the case fully supported a jury instruction on conscious avoidance. And second, the district court did not abuse its discretion in excluding the defense's proposed expert witness. In this case, the defendant was guilty because he had, as an attorney, he had heightened obligations to ferret out the fraud of his client. Rather, the government argued, and the evidence fully supported a finding by the jury, that the defendant was guilty because he was a participant in the fraud that was being committed. That's what the evidence supported in this case. On the issue of conscious avoidance, there was more than sufficient evidence to support a conscious avoidance instruction. There was overwhelming evidence that the defendant had actual knowledge of the fraud, and there was also ample evidence that he consciously avoided knowing about it. There was evidence that the defendant was confronted with sign after sign that Junior was attempting to purchase Maxim magazine through fraud, and that he consciously avoided confirming that fact. And any one of those signs and the defendant's being confronted with them was enough by itself to support a conscious avoidance charge. So what in your view was the strongest evidence? If the jury, the other verdicts suggest the jury may have had some doubts about some of the evidence the government presented, and a lot of the evidence seemed to go to actual knowledge. I would be concerned maybe that the jury might have thought, well, we're not sure he really had actual knowledge, but something short of that is okay. So what would you say is the strongest evidence that he looked the other way, rather than finding out the truth about the transactions that he was participating in? Yes, Your Honor. So I think that the strongest piece of evidence that he looked the other way was the testimony of Brent Watson, the broker at Merrill Lynch, who testified that he spoke with the defendant, and first he told him that the bank statements that were being shopped around were fake, and then he also testified that he then told the defendant that internal investigators at Bank of America had learned that the account had been closed and didn't belong to the father. And if the jury credited Watson's testimony, as they were certainly entitled to do, that was enough standing alone, because in the face of being confronted with that from Mr. Watson, the defendant kept right on shopping the deal. He didn't take any steps to verify or dispel the information he had learned from Mr. Watson. He didn't tell his law firm about it. Instead, he kept on shopping the deal and shopping around the fake bank statements. So that was enough by itself to support the conscious avoidance charge. There were other facts as well presented in evidence that supported the conscious avoidance charge. The spoofed e-mail, for instance, the defendant was confronted with multiple red flags suggesting that that spoofed e-mail wasn't real. Nevertheless, when he got it, instead of doing anything to investigate or taking even the minimal step of confirming orally with Mark Weinberg that the release of the funds had actually been authorized, he released the money to the sellers of Maxim. And there was ample evidence for the jury to find that that was enough as well to support the conscious avoidance charge. On the issue of the defense's proposed expert witness, the concepts that the defense's proposed expert would have testified about were really not contested in the case. The meaning of the concepts, the meaning of restricted stock, the meaning of pledging collateral, that wasn't contested. What was in dispute was whether the defendant committed fraud by lying about these uncontested concepts. What about the use of restricted stock as collateral or offerings that same collateral to several different potential investors at the same time? They argue that that would have benefited from some neutral explanation. Do you disagree? We do disagree. On the issue of restricted stock, the testimony was that the defendant lied about the restricted stock by describing it to lenders as freely tradable and freely tradable. When the lenders confronted the defendant with the fact that these stocks are actually restricted and not freely tradable, the defendant then lied again. And he said, well, they have value because seniors are going to retire from these   boards, and so they will be tradable. But that wasn't true either. And there was testimony on that point as well. And then on the issue of shopping collateral to multiple different lenders, it wasn't everyone agreed that shopping a deal to multiple prospective lenders simultaneously wasn't standing alone problematic. The problem here was what the defendant was doing. He was promising investors a first priority and a sole interest in the same collateral, which was bogus collateral, that had already been guaranteed to other investors. And he wasn't disclosing to the investors that it was already pledged to other people. So he pledged the same collateral to OpenGate, which he then promised to Mark Weinberg, and he then offered it to ComVest. He offered to ComVest that they could have a first priority and sole interest in that same collateral. And he didn't disclose that the collateral was already promised to others. So that was the dispute, not the general concept of what it means to shop collateral, but what the defendant did with the collateral that was at issue in this case. On the issue of the defendant's law firm, which was an issue that was raised in the defense's brief, the fact that the defendant did make some disclosures to his law firm, that wasn't a reason to exclude a conscious avoidance instruction. What's important to remember here is that the defendant hid many aspects of the deal from his law firm. He knew a lot more than his law firm did. Even after the spoofed email was discovered, there were things he did not tell the law firm about his conversations with Brent Watson. He didn't tell his law firm that OpenGate had filed a lawsuit against Senior in relation to the deal. He didn't tell his law firm that Senior had fully withdrawn from any participation in the deal. And so to the extent the defense's argument is that the fact that the law firm continued with the deal, that has some significance with respect to the defendant, the government disagrees, because the defendant was differently situated and knew much more than his law firm did. So unless the court has any further questions, the government will ask that the court affirm the judgment of conviction. Thank you. Barbara, you do have time reserved. Thank you, Your Honors. Briefly, the concept of conscious avoidance cannot be fairly applied without understanding the context of the situation in which the defendant was acting. And that is the information which we submit our expert would have supplied and which was lacking in the record. I want to just address a few of the specific things that the government argued. First of all, as to Brent Watson, his testimony was disputed by Mr. Newkirk. There actually was no record that he had ever spoken to a compliance officer at Merrill that you might have expected there would have been, had he. And in addition to that, there was no record that he had called and left a voicemail for Mr. Newkirk, which he had testified. I would also point out that during a lot of this period of time, Mr. Newkirk's wife was in the hospital, gravely ill, and he had a newborn baby who was in intensive care What's the point here? The point is that the government has misrepresented in its argument here that its position at the trial, which was constantly telling the jury, for example, that the restricted stock was worthless, which was incorrect, and also in terms of the pledging, there was $30 million worth of stock, something like that. So pledging the same collateral when OpenGate only had a $3.1 million security interest. I would just like to end by saying that, as in Litvak, Mr. Newkirk was entitled to have expert testimony to set forth the objective industry practice, the fiduciary duties, and to provide information on the question of materiality. This was not harmless error. It wasn't abuse of discretion. The cases cited in the brief support the admission of expert testimony, and in light of the weakness of the government's case and the very real chance that Mr. Newkirk has been wrongly convicted, we would ask this court to grant him a new trial. Thank you. Thank you very much. Thanks to both sides. We'll take the case under advisement.